Good morning. My name is Paul Zimmerman. I'm representing Dr. Lieberman, the appellant in this issue. Your Honors, you cannot hope to get away with embedding a factually ascertainable statement in an opinion and have it subsumed under the rubric of opinion and make it unactionable. And that's exactly what the appellee is trying to do in this case. He made a number of specific statements concerning Dr. Lieberman which go directly to her profession as a psychiatrist and as a professional expert witness. In particular, he indicated that she overbilled and that she was mentally unbalanced. But he went even further than that. He indicated that because of those two particular things, he refused to use her services in the case he was trying. We know, in fact, that that was not true. There was no evidence that she was mentally unbalanced. She did not submit a bill of $100,000 in the underlying criminal case. And, in fact, Mr. Fieger did not make the choice not to use her at trial. In fact, what happened is she chose not to travel from California to Michigan to give testimony because she had not been paid for her prior work. And at that point, she filed suit against Mr. Fieger to try and force him to pay her for the work she had done. Now, Mr. Fieger thereupon goes on television, goes on court TV, and starts slandering her by making these comments about her. And he, after making these factual statements, he suddenly starts saying that she's a nutcase, she's mentally unbalanced. He also attributes this attribution of mental unbalance to the individual who had retained her as an expert witness in the underlying criminal case. That was Mr. Burdick. Scalia. Would you say that Looney Tunes, a nut growing on a tree, aren't those just hyperbole, really? Waxman. They can be hyperbole. And if they were stated in isolation, yes, they would be hyperbole. But in the present circumstance, where you have a specific allegation based on the supposed testimony of a third party, that she was mentally unbalanced. And mentally unbalanced is not hyperbole. It's a fairly precise term, particularly as applied to someone whose job is assessing mental illness. Kennedy. Well, perhaps. But then when you add in Looney Tunes and nuts growing on trees, it sort of puts it in a different context, it would seem to me. I mean, the question I have, and I want you to get to that, but this is relevant to my comment. In your cause of action, you limit, at least as I read it, and that's what I want you to clarify, it looks as though you limit your claims of defamation to these statements, mentally unbalanced, crazy, Looney Tunes, subject of ridicule by court, pertaining to her expert testimony, nuts growing on trees, and improper charging for a retainer. I don't see any reference of defamation in your pleadings as to the overbilling and refusal to use her services to which you allege. Improperly charged money for a retainer. That's all. But my question to you first is, was there any supplemental pleading to this? I think I've got the first amendment. No, there was no supplemental pleading. Then to return to the question, why in context isn't the reference to mentally unbalanced simply hyperbole when you're also adding crazy Looney Tune and nuts growing on trees? Because, and I think this is where reference to the Weirich case and the, from I think the D.C. Circuit and the Flowers case, which was cited by appellees in their letter of last week, is significant. Because even when, let's say you can, and I'm not conceiving this, let's say that the terms Looney Tunes and nuts growing on trees in and of themselves are hyperbole and they're non-actionable. When you make those statements in a context in which factually verifiable statements are also made, at the very least you have to separate out the factually verifiable statements and go to trial on those and give immunity if you're planning to do it for the hyperbole. But I think that the hyperbole, when it's anchored in these sort of factual assertions and seems to grow out of and comment on and expand on what's presented as a factual situation, it's not hyperbole in an unmediated sense, but it's hyperbole in the sense that he's extending the description of something that he has previously claimed to be fact. And we know that these claimed facts, like that she billed $100,000, was simply not true. She only billed 25 percent of that. We also know that it's not true. Why is that defamatory? I mean, we know it's a false fact, but why does it have defamatory meaning in this context? It has defamatory meaning in this context because it implies, in the context of all his comments, it implies that she improperly charged for a time that she didn't do, and that's the same thing he's claiming that she did to him. So it's making the accusation that she, as an expert witness, is dishonest in her billing practices. And that goes directly to her profession. I mean, if lawyers are watching this show, and Court TV, aside from the general interest of the public, is watched by lawyers, somebody looks at this and hears somebody say, well, this woman overbills. And the Court laughed at her because she billed so high and because she was incompetent. It's an attack on her profession. And we know also that the Court did not laugh at her. It denied the fee request simply because there wasn't enough money in the budget for it. We also know that Mr. Burdick, the other attorney who retained her, didn't say she was a bad witness. Certainly, he didn't say that to the Court when he was trying to get the fees. He said very specifically that thanks to her and the other psychologists, Mr. Schmidt was found guilty of the lesser charge of second-degree murder, not first-degree murder. Another thing I wanted to address is, and under Malkovich and its progeny, the context is considered very important in setting the stage for whether the comments themselves are considered to be opinion or fact. In this instance, a lot of what the appellees are putting forward to establish the context is not really the context. The context is what the particular audience is aware of. So as far as the press release that Dr. Lieberman put out, there's no evidence that the Court TV audience or that any part of the general public was ever made aware of anything contained in that press release. So that had no part of the context of Mr. Feiger's remarks. The context was entirely formed by Mr. Feiger, who decided to go out and be interviewed. Well, she served him right during the course of the trial, or she had a processor serving. Well, two things on that. During a break. Wasn't it during a break during the trial? It was apparently during a break, but contrary to what the district court said, the Court TV. Right. It was on TV, but it was during a break. It was on TV. But that they said, well, this was just served on you, or would you comment? He said something to the effect that, yes, you've been served. I don't think they specifically indicated that he had just been served. And I don't see why that's so. I think there was some temporal relation, but it wasn't an ambush saying you just got served with this. Right. And another thing I think that the appellees are trying to bring into the context is something in the way of a provocation defense, which is not applicable here. He's saying, oh, my God, I was afraid she was going to tank my case. Therefore, I went on TV and said all these things about her. Well, to my knowledge, there's no provocation defense to slander. It's strictly an issue of whether or not the statements he said could possibly be found to have contained provably true assertions. And I think that's pretty self-evident in this case. In fact, the appellees themselves claim that the allegation of being unbalanced was true. I mean, if they're claiming that it's true, how do they pass it off as Mr. Feiger's opinion? Well, I think in the context of the case, Mr. Feiger went off on a rant against Court TV and a bunch of other folks in the context of this interview. And intervened later and he confessed that he hadn't even seen the sections of the segments of Court TV that were supposedly biased. I mean, this was a the context is a general rant against a number of people, one of whom unfortunately included your client. Well, two things on that. First of all, the rant against Court TV was in the context of a debate with Court TV. The Court TV people were there. My client wasn't there. No, I understand that completely. But I guess we're trying to find context and defamatory meaning. And they said, what about this suit? And he says, oh, this is loony tunes. This is crazy. Which is, I think, fairly, you know, those kinds of rhetorical devices are probably not actionable. Then he combines it with she sought $100,000 and was denied the fee. Well, it's true that she was denied the fee. It was not true that it was $100,000. It was not true that the court laughed at her. Although I suppose one might, you know, characterize it that way, be hyperbole. How does context help you in this case, do you think? Well, it helps me in that I think the context should be seen as limited to the remarks themselves and the facts that are embedded in the remarks. I think that the appellees have gone out of their way to include a lot of extraneous stuff, which where it's not an outright attack on Dr. Lieberman's character is, as I said, an attempt to try and bring Mr. Figer's state of mind as some part of the context in the way that you might, as I said, you might have a provocation defense if it were an assault or a battery case or something like that. And it seems to me that the context here is that you have this man going on television and, you know, as far as him making a rant against court TV, specifically he's criticizing court TV for being unfair and for not getting the facts right. And he's setting himself up as someone who is a victim of false facts, a man who cares about facts, and he wants to set the record straight. And then the next thing you know, he goes into this attack on Dr. Lieberman where he attacks her billing, he attacks her mental stability, he falsely claims that he never was going to put her on the witness stand, which we know from the evidence is simply not true. And then from there he goes on and starts saying, well, she's a nut job, blah, blah, blah. I mean, if he had just said, ah, she's crazy, that suits nuts, I think appellees would have a good argument. But where he goes on to specify, as he did, or where he starts out specifying the very situations and the attribution to third parties on which he bases his claim that she's mentally unbalanced, I think you have there a situation in which the viewing audience says, well, he seems to have a factual basis for making this claim that she's mentally unbalanced. And there's the facts are false. And when that's the situation, when somebody puts out false facts, then you have actionable statements under the slander laws. Okay. I think we have your argument in hand. Do you want to make a few more points? I want to just briefly address the issue of the fraud claim. And I think there is a fairly straightforward one of the court overstepping its bounds and making the determination that Mr. Feiger's comments to the effect that he never had it in his mind to pay her. I mean, to me, that can easily be interpreted as an indication that he had an intent not to pay her. The court went the other direction. And I think it's not really an issue of whether the court was right or wrong in making that determination, but that it's not the court's determination to make. It's for the trier effect. Okay. Thank you. Thank you for your argument. Good morning, Your Honors. My name is Eric Jackson. I'm counsel for Defendants and Appellees Feiger, Feiger and Schwartz and Jeffrey Feiger. Yes, I mispronounced his name. I'm sorry to begin with. That's fine. This is a case where it's all about contacts. And I think it's very clear in the legion of authorities that relate to or that support defamation law. This is the district court's opinion was entirely correct. And if you look at what this case is really about, it really is about, Your Honors, Lieberman's filing of a lawsuit, serving Feiger in the courthouse with that lawsuit during his high-profile trial, and issuing a press release accusing him of plagiarism. And these are all facts that the Court TV audience knew. And ---- Did Mr. Feiger know of the press release at the time? If you look at his statement, not only did he know about the press release, but he mentioned it in the interview with Court TV. If you take a look at the Feiger's excerpts, page 191, that's the amended transcript, he mentions it. Quote, she even claims I see in a press release that she owns certain phrases that I used in my opening statement, and she claims to be the ownership of phrases. And then he goes on with his rant. So, yes, he not only knew of it, he mentioned it. And I think we can fairly infer that Court TV must have known about it, which is one of the reasons why they asked him about the lawsuit. Incidentally, if you look at the videotape, you will see that the Court TV interviewer mentions that Feiger is actually holding the lawsuit in his hands. It's not mentioned on the transcript. It's written, but it's in the videotape itself. But if you look at the context, Your Honors, and I think we all have to, and we acknowledge that the under Feiger case is the case that applies to the fatality of the circumstances, you have the broad context, you have the specific and narrow context, and then you have the question as to whether these statements are provable, true, or false. I mean, let's just start with the broad context, which is the setting, et cetera, and I think we all know that. Let's just list everything that the Court TV audience knew, because, again, we have to look at this from the point of view of the reasonable person that was watching this, allegedly watching this Court TV broadcast. They knew there was a dispute, a business dispute between these two people that was contentious. They knew that this was right in the middle of Mr. Feiger's high-profile case in which he is the attorney representing the plaintiffs. They knew that he's on Court TV for the purpose of providing his response and reaction to the events of the day in the trial. So when they're sitting there, they know not only to expect his opinion or slant or spin on the facts, and they also understand that the questions that are going to be asked of him relate to his lawsuit. In addition, they know, the audience knows, that he was served with a complaint and attacked by somebody, a legal attack by someone who was in some way connected to the case. And they also know, because Mr. Feiger explained to them that she had issued a parcel lease in which she accused him of plagiarism in connection with his opening statement in that case. And if you take a look at all of those things, essentially, counsel talks about this provocation defense. No, she, the audience is going to know that by filing a lawsuit and issuing a press release, that Lieberman is really inviting his comment. And that's exactly what she got, and that's what the First Amendment is designed to protect. Except it's not designed to protect false facts, and there were some false facts in the, in his remarks. Do you agree with that? It's not designed to protect false facts if they are defamatory, Your Honor. Right. And in this context, we would submit that they are mere exaggerations. And really the point of those, the utterances of those statements was not whether or not she actually submitted, for example, a bill of $100,000, but the fact that she submitted a large bill and the court denied it, that's the point. It doesn't really matter to the court TV audience whether the bill was $25,000, $100,000, or $5 million. Point was, his point, the point was it was a lot of money. And whether he had said $25,000, a lot of money, $100,000, I don't think any of that matters. And there are a legion of cases that says exaggerations when you're looking at in context. Well, let's go down it bit by bit. Was it true that Mr. Burdick did tell your client in no uncertain terms that she was mentally unbalanced, a terrible witness who was disliked by the jury? Well, that particular point has been admitted by Lieberman. She sued Mr. Burdick in this case for that very fact. Well, she sued him for that. But, I mean, I'm asking you, is that a true statement, given the record of this case? Well, he submitted a declaration in the case in which he said that. Well, I'm sorry, with regard to mentally unbalanced. I mean, Burdick. The jury disliked her. Okay. Burdick, I'm sorry, Burdick submitted the declaration? Burdick submitted a declaration in this case in which he talked generally about some of the allegations that Lieberman had made against her. And that would be found at FIDER Exhibit, Exhibit Record 280. I don't recall in that, and I could be mistaken, that he called her mentally unbalanced, though, did he? I don't know if he used those terms, Your Honor. But what he said here was, for example, quote, the jury in the criminal trial not only didn't believe plaintiff, meaning Lieberman, but they resented the improbable and exaggerated suggestions or assertions the plaintiff made to them as they publicly and vocally stated at the conclusion of the trial that they will no doubt reiterate or called upon to testify. And then before that, he goes on to describe what some of the members of the jury. Yes, I took that. That was my recollection. But I don't think that Mr. Burdick, and I could be mistaken, I'll check the affidavit, said that she was mentally unbalanced. Well, if you take a look at what Mr. Figer is saying in both the specific and the general context, it's colorful language. When he's using the phrase mentally unbalanced, what he's talking about is he's putting it in context with crazy, loony tunes, nut growing on trees in California and all of those things, which is meant, if you look at the statements, to indicate not that she's insane, not that she has some sort of a mental deficit, but rather that she's a publicity hound. And if you take a look at his statement, I think that's the only fair reading that anybody could see that is watching core TV, especially in context when here Mr. Figer is reacting to Lieberman's filing of a lawsuit against him being asked about it on core TV. I mean, it says basically the interviewer starts off, says, quote, Carol Lieberman, a psychiatrist who testified in a criminal case for the defense, is suing you now, and I want your reaction to that. And Figer gave them his reaction. Yes, he used colorful language. He used rhetorical hyperbole. He used figurative language, all of which is protected. And no reasonable core TV audience member is going to think that Mr. Figer is giving a fact-based, disassociated dissertation on whether or not Lieberman is mentally unbalanced, whether or not he's repeating what someone else said who is simply another lawyer, and he identified another lawyer from the criminal case, or whether he's saying it himself, because he put it in context. He listed exactly what she did. She issued a press release in the case. She sued him during the trial of his high-profile case. He doesn't want to call her as a witness in trial, and she wants a piece of the action. She wants to get involved, and that was what he was trying to convey. And I don't think that you can simply parcel out some of the statements that he said in this particular context and say, well, you know, maybe there's a question as to whether or not Mr. Burdick actually said that she was mentally unbalanced, because the point of what he's trying to make here is not to say that she's literally mentally unbalanced. It's rather that she's simply a publicity hound, and these are the colorful metaphors that he's using to describe that. And there are legions of cases that we cited in our papers and also in the book. I think context helps you for the reasons you've described. Context helps, I think, Ms. Lieberman in the sense that if we're looking at the sting or the gist of it, the gist of it is that she is not a credible witness, that she overcharges, and, in fact, that a court laughed at her when she submitted a bill. And that is a slightly different inference and implication, I should say, than mere picking things out and saying, well, $100,000, but $50,000, but sure it was only $24,000, but, you know, boys will be boys, that was hyperbole. If you weave together false facts with the remainder of opinion in a way that creates a false impression based on facts, then they do have something that's actionable here. So how do you respond to their theory on that basis? Well, I'll respond to it in a couple of ways. First of all, when we're talking about what happened in the criminal case, that's tangential. The key thrust of what he's talking about here with his terms crazy, Looney Tunes, and everything else, the publicity, the press release and the complaint filed against him, those are the issues, the amateur case, the civil case in which he's involved, that are primary issues. He mentions some things that happened in the underlying criminal case, really to add flavor to it, but if you take those away or if you add them, it doesn't really change what the court TV audience is going to think about this, which is simply that Mr. Feigner is defending himself against somebody who's accusing him of something, which is exactly what the First Amendment is designed to protect. Second of all, with respect to the actual, you know, allegation, these are somehow, these Smith's case things are somehow not factually correct. If you take them, number one, in context, he's not literally trying to make a statement that the court laughed at her. There's a case called Falado in California, in which the identical allegation about the court laughing at her was held not to be actionable, simply because it's just a colorful way of saying that the court denied a motion. There's no evidence whatsoever that Feigner's statement that she submitted a large bill, $100,000, is somehow indicative of billing fraud or anything else. It's simply that he's saying that she submitted a large bill, which is exactly what he is trying to make the point, which is parallel to the point he's trying to make in this case, which is she wanted to charge me a whole lot of money to come to Michigan to testify, and I think she's a fact witness, and I didn't want to pay her. And so the point is that it's ambiguous. I mean, at best, and it is plaintiff's burden to provide evidence to show that somehow it has a false and defamatory meaning, and he didn't do that. It's not even, as you indicated, it's not mentioned in the complaint as it's required to be. These other statements need to be fled and proved. There's no evidence whatsoever that any of these other statements that he's talking about in the Schmitz case carry the kind of specific defamatory meaning that he says they did or that the counsel is now arguing that they did. And not only that, but with respect to what – take a look at these statements very specifically. Again, if you look at, you know, she submitted a bill for $100,000. That's exaggeration, Your Honor. That is not – you know, it doesn't have any meaning to the Court TV audience, whether it's $25,000, $100,000, or anything else. It just means that she submitted a large bill. And when phrases are ambiguous and the plaintiff has not met their burden, clearly these statements cannot be held to be defamatory, especially when looked at in context. And I think that there's – the law on this argument, Your Honor, is that there's a question as to whether or not a particular statement can be held to be true or false or provable true or false, and it's close. Quote, a court should err on the side of non-actionability. And that's from Steen Press Holdings. But where does malice, actual malice, fit into this case? Well, malice, Your Honor, if in the event that you decide that one of these statements or more of these statements are defamatory, or it's like that, or a reasonable viewer could see any of these statements as defamatory, then this case would go back down and they would be used. The Court didn't reach a determination on that. No, the Court never reached a determination on it. But essentially, if Lieberman has proved to be a public figure, then she would have to prove that Fiber acted with malice in making the statements. Go ahead. Which we think would be a, you know. Well, this Court here, this panel, can it decide the case on malice? Malice was shown or was not shown? That issue was not put before the district court, Your Honor. However, the Court can decide the preliminary – one of the preliminary elements of that, which is whether or not Lieberman was a public figure. Did the district court address that issue? The district court did not because the district court found that all of the statements were non-defamatory in nature. But there was evidence. I mean, but the moving parties argue for the fact that she was a public figure. That's right. Or at least a minimum unlimited public figure. Right. I mean, in essence, by, you know, reaching the press release, but her involvement in this case, she's a public figure. So your position is that if the Court finds these statements defamatory, would have to go back down to determine if there was actual malice? We would then bring a motion for summary judgment on the fact that there's no evidence of malice. But this Court could not decide it on that basis? Not at this time, Your Honor. I don't believe so. Well, I suppose we could, but I think given the fact that it has been briefed and it wasn't argued to the district court, it would be proper or improper for us to do so as a matter of prudence. That's right. I don't think we're prevented from doing it. Would you address the fraud claim? Yes. The fraud claim simply, if you take a look at the complaint, there were no facts put in the complaint relating to specifically what this fraud was. And the motion for summary judgment was brought on the ground that Plaintiff Lieberman had no evidence whatsoever to prove that Figer intended to defraud her. In reaction to that, Lieberman put forth one paragraph statement from the deposition of Mr. Figer in which he indicated that the thought of whether or not he intended to pay her never crossed his mind. And the district court held that that's the evidence. That's not enough evidence to show. The evidence, as I understand their claim, this fraud claim, which I guess was related to the breach of contract claim to some extent, is that there was an oral agreement that she would be an expert witness in this trial and that he did not intend to pay her for her full services at the time she contracted with him, even though he asked her to review all of these court records. Well, I think that there's some disconnect there between whether he asked or his firm asked. People at his firm did send us some records. The point is that it wasn't a contract that she would be an expert witness at trial. The contract, there's some factual dispute as to what the nature of the actual contract was. But the bottom line was that she had been a factual witness. Well, but the fraud claim is related to the contract. I mean, it was an agreement. She contends it was an agreement to retain her as an expert witness in this trial. That is what her contention is. And that they did so without any intent of ever paying her. That's right. And, in fact, they did pay her a retainer of $2,500 at the beginning of January. Well, that suggests that there was some agreement that she was going to be an expert witness or something was afoot. Well, if you look at Mr. Fieger's statement to the Court TV audience, he explained that he believed she was an expert witness below and that she was a fact witness below, and that he had to find some way to get her to testify in this case. So there's some dispute as to what the nature was of her relationship with him. But the issue became whether or not the, you know, she had any bills that she submitted actually reflected review of records and what detail there was to prove that she did that. And that contract then was ultimately settled. So now all we have left is this argument that somehow he never intended to pay her any money at the time that he retained her in the beginning. And so that is, you know, Mr. Fieger, there's absolutely no evidence of that. There's nothing that was pled on that. And the only evidence that they have is this one paragraph statement where Mr. Fieger said that he never, that thought never crossed his mind. I think I'm just paraphrasing what he said. But that, we, the district court, in our opinion, clearly held that, and correctly held, that that wasn't an evidential intent. And there was absolutely nothing else offered by Lieberman on that point whatsoever. So when we're talking about a fraud claim, you have to plead and prove there's more specificity than general negligence claims and contract claims and things like that. I think that the Court doesn't weigh in the evidence. It's just simply looking at what was provided by the party opposing the motion for summary judgment to try to, you know, get to a trial, issue a fact with respect to the issue, and the judge said that's not enough. Perhaps you've answered this as best you can in answer to Judge Piazza's questions, but I've never quite understood the argument that she was a fact witness. You send a, I mean, as I understand what happened here, there was a retainer paid and 30 depositions or transcripts were sent out to her for a review, and then her deposition was taken. I don't, explain to me why. It's similar. The argument is it's similar to the treating position. In other words, he wasn't asking her for her current opinion as to the, whatever the issue was. Oh, I see what you're saying. Yeah. I think, well. But obviously there is an expert opinion. He's just not, she's not a retained expert to testify for him. Even treating positions are experts. If you ask them for their current opinion, not if you're asking them for what their opinion was at some point in the past, number one. Number two, if you look at what Fider explained to the court TV audience, she had a lot of contact with Schmitz and the people involved in this case that went beyond what the normal expert witness would do. She was writing a book about the subject. She had a lot of just general knowledge, and I think what they were considering doing was perhaps having her come in and testify as to what her interactions were with Schmitz and things like that during the case. They ultimately decided not to do that. But with respect to the defamation claim, Your Honor, here, I hope I've answered the question as best I could with respect to that issue. What's really relevant here, Your Honor, is if you look at the overall tenor of this in the context of what the court TV audience was expecting from Figer, and the point is that I think that what Lieberman's counsel is attempting to do here is to shift the focus away from the argument that they made below because I think it's pretty much everyone would say that that argument is not a quote-unquote winner. And in the appellate papers, they're trying to come up with some arguments regarding statements that they didn't even think were defamatory enough to put into their complaint in the first place initially. And so if you take a look at the complaint also, there's no evidence whatsoever of the context in which the statements were made. The press release wasn't mentioned. There was no information as to how it was that Mr. Figer came to be requested to respond to the complaints. In other words, you know, the way that the complaint reads that he called a press conference. He didn't call a press conference. He happened to be holding the complaint in his hand. And because Lieberman is someone who was involved in the case and had issued a press release, Court TV apparently decided that they want to ask him about this and ask him for his quote-unquote reaction. And so if you take a look at his statement in that context, he did mention some things about the underlying case. But, you know, in terms of who Mr. Figer is, the nature of that high-profile case, the fact that she's issuing a press release accusing him of plagiarism is what he indicated to the audience. And the fact that she had issued a complaint basically attacking him and the fact that Court TV is asking for his reaction, he is getting a little animated here, and I think it's clear that he is doing that. But in the context in both the way the words were used and the general context of the setting, all of those statements taken together could not be anything other than rhetorical hyperbole and non-actionable rants. Your time has expired unless anyone has any further questions. Yeah, you have your bottle. You have seven minutes and 34 seconds if you care to use it. I want to just address a couple of issues that were raised by Mr. Jackson. First of all, as to whether Mr. Figer was animated in his press conference, I think that's best determined by looking at the videotape, which we referenced out of the court file. He was not animated particularly. He was sitting there discussing it. He seemed animated to me. Did he? Well, he took it to me. To me, it seemed like he was relatively, especially if you compare it to his performance in the trial itself. Okay. Well, I didn't see that. In that context, he was relatively wrong. You may be right. Also, I want to just clarify this expert witness issue. There's no doubt that she was retained to be an expert witness. And when Mr. Figer indicated in the press conference that he did not intend to call her, that was because she indicated to him that she would not travel to Michigan and testify unless she was paid the money that was owing to her. And more to the point on the expert witness issue is the defense in the Amador case made a motion to have her excluded as an expert witness. And Mr. Figer opposed that motion. And she remained on the list as an expert witness for the plaintiffs in that case. What was the substance of their agreement? The substance of their agreement? Yes. It's contained in the two one-page retainer letters that she sent to Mr. Figer. He signed it on two separate occasions. Basically, it was an agreement to pay set fees for various kinds of work, so much for deposition testimony, so much for review of records. I mean, there's certainly not attempting to claim that there was any contractual obligation on his part to make her an expert witness. There wasn't. I mean, if he decided that he didn't want to use her, that was certainly his right under the contract. But that decision was not made by him. In fact, there are numerous letters from his office to her continually asking her to make herself available to come and give testimony at trial. I mean, he had every intention of using her as a trial witness, except for the fact that he was hoping he could get her to do it without paying her. And it's when he didn't pay her, and based on the ---- Well, he did pay her $2,500. Well, he paid her her initial retainer, because obviously if he hadn't paid that, he would have gotten nothing. But after he paid her that initial retainer, he didn't pay her a penny for anything else she did. She was paid for the deposition, but she was paid by the defendants who took her. So is your claim that after he paid her the $2,500 that he never intended to pay her another cent? Or is it your claim that at the time he retained her as an expert, he never intended to pay her? He never intended to pay her anything beyond what he had to, and that's the $2,500. And we also submitted evidence to the fact that this was a common practice of his in regards to expert witnesses. We cited some six cases that were filed against him by expert witnesses that he hadn't paid. And as you know, you can prove fraud by evidence of pattern and practice. As to the intent, it's very difficult, as you know, to prove intent in a fraud case. It seems to me that this comment by him, that it never entered his mind to pay her, I mean, that's about as good an evidence that you're going to get of intent to commit fraud as I've ever seen. I mean, usually you have to prove it by inference from the actions and from the past practice, and here you have a guy saying, well, I never, you know, I was never going to pay her, never even entered it in my mind. So, but again, the point is not whether, how that statement should be interpreted, but that it is open to interpretation, and that's something that made it a tribal issue of fact and should have been left to the trier of fact and not passed upon by the district court. And finally, I want to address the legal standard in particular. And based on the Malkovich case and on also the Flowers case and the Weirich case, the standard is not that you err in favor of finding it non-actionable. The standard very specifically set out by the Supreme Court in Malkovich is that if it could be interpreted by a reasonable jury as a factual statement, then it goes to that jury and it doesn't get the protection under the First Amendment of being simply an opinion. Thank you very much. Thank you both for your arguments. The case just heard will be submitted.
judges: Thomas, Paez, Reed